Filed 12/12/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PACIFIC CORPORATE GROUP HOLDINGS, LLC, | D062277 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. 37-2007-00105668-CU-CO-CTL) |
| v. | |
| THOMAS KECK, | |
| Defendant, Cross-complainant and Appellant. | |

APPEALS from orders and a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed in part; dismissed in part.

Pettit Kohn Igrassia & Lutz, Douglas A. Pettit and Jenna H. Leyton-Jones for Plaintiff, Cross-defendant and Appellant Pacific Corporate Group Holdings, LLC.

Edelson & Rezzo and L. B. Chip Edelson for Defendant, Cross-complainant and Appellant Thomas Keck.

I.

INTRODUCTION

Pacific Corporate Group Holdings, LLC (PCGH) brought this action against its former employee, Thomas Keck, seeking to collect on a promissory note. Keck defended against the action by claiming that any money that he owed PCGH was offset by monies that PCGH owed him. Keck also filed a cross-complaint against PCGH seeking damages for unpaid bonus and severance payments that he claimed were due to him pursuant to two employment agreements. In a special verdict, the jury found that PCGH owed Keck $270,547.95 under the terms of a 2006 employment agreement (2006 Agreement). PCGH filed a motion for judgment notwithstanding the verdict (JNOV) or for new trial on the ground that there was no substantial evidence to support the jury's finding that the parties entered into the 2006 Agreement. The trial court denied PCGH's motion. Keck filed a motion for additur, or in the alternative, for a new trial on damages, on the ground that the jury had awarded inadequate damages in light of the bonus and severance provisions in the 2006 Agreement. The trial court granted Keck's motion, and issued an additur and conditional order granting a new trial on damages. PCGH refused to consent to the additur, and thus, the trial court's order directing a new trial on damages became effective. Both parties subsequently filed motions for attorney fees, which the court denied.

2

PCGH filed two appeals seeking reversal of the judgment; the trial court's order denying its motion for new trial and JNOV; the trial court's order granting Keck's motion for additur, or, in the alternative, a new trial on damages; and the trial court's order denying its motion for attorney fees. Keck filed an appeal from the trial court's order denying his motion for attorney fees.

The trial court's order granting a new trial on damages resulted in a vacatur of the underlying judgment. Accordingly, we conclude that we lack appellate jurisdiction to consider PCGH's appeals from the judgment, the trial court's order denying its motion for new trial, and the trial court's order denying attorney fees. We also conclude that we lack appellate jurisdiction to consider Keck's appeal from the trial court's order denying attorney fees. We affirm both the trial court's order denying PCGH's motion for JNOV and the trial court's order granting Keck's motion for additur, or in the alternative, a new trial on damages. We remand the matter to the trial court with directions to conduct a new trial on damages and any other necessary proceedings.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The trial*

PCGH is an investment advisory firm. In 2005, PCGH hired Keck pursuant to a July 8, 2005 letter agreement (2005 Agreement). The 2005 Agreement stated in relevant part:

3

"On or prior to June 30, 2006 you shall receive a $100,000 incentive compensation payment as an advance on the 2006 Bonus and such payment shall be deducted from the final 2006 Bonus amount determined by [PCGH] for the fiscal year ending December 31, 2006."

Keck never received any bonus pursuant to this provision of the 2005 Agreement.

Keck signed a promissory note in favor of PCGH in exchange for a $200,000 loan in March 2006.

In the fall of 2006, Keck engaged in negotiations with PCGH, including with its chairman and chief executive officer, Christopher Bower, concerning both a new employment agreement and a new equity sharing agreement.[1] PCGH made a written offer of employment to Keck on November 30.

Keck signed the offer, and, on December 1, sent Bower an e-mail informing him that he had signed the 2006 Agreement. Bower responded by sending Keck an e-mail that stated, "Great."

On November 30, 2006, PCGH paid Keck a signing bonus of $50,684.93, as required by the terms of the 2006 Agreement. Samantha Sacks, PCGH's former senior vice-president of accounting and finances, authorized the payment because PCGH's management gave her the 2006 Agreement and instructed her to pay the bonus. It was

---

[1]     Keck testified that several of PCGH's clients had expressed concerns regarding employee retention issues that PCGH was experiencing, and explained that the equity sharing agreement was put in place in order to help address the retention issues.

Sacks's understanding that the 2006 Agreement "was final." Bower also informed a representative of the California Public Employee Retirement System (CalPERS), an important client of PCGH's, that the 2006 Agreement had been finalized.[2]

PCGH terminated Keck on December 12, 2006, after learning that Keck had called CalPERS in order to caution CalPERS to carefully read the terms of the new equity sharing agreement at PCGH.

At trial, Keck acknowledged that he had paid nothing out-of-pocket to repay the March 2006 promissory note. However, Keck contended that any money that he owed PCGH on the note was offset by amounts that PCGH owed him under the 2005 Agreement and the 2006 Agreement.

B.      *The jury's verdict and the judgment*

The parties agreed to a special verdict form that began by stating, "The parties agree that [PCGH] loaned $200,000 to [Keck], he signed a Promissory Note dated March 21, 2006, and he has not made any payment." The jury found that PCGH owed Keck "$100,000 for a bonus payment due on or about June 30, 2005,[3] payable to Keck or payable for his use in repayment of the Promissory Note." The jury also found that PCGH and Keck entered "a new employment contract, [the 2006 Agreement],

---

2      CalPERS had previously expressed concerns regarding PCGH's employee retention issues, and its representative had sent Bower an e-mail the previous day inquiring as to whether Keck's employment agreement had been "signed by all parties."

3      Although the verdict form stated "June 30, 2005," it is clear that the correct date is June 30, 2006.

replacing his initial employment agreement of July 8, 2005, based upon the terms of a November 2006 offer of employment." The jury further found that PCGH "fail[ed] to do something that [the 2006 Agreement] required it to do," and that this failure caused Keck to suffer $270,547.95 in damages.

The trial court entered a judgment that recited the jury's special verdict and stated, "Accordingly, it appearing by reason of said special verdict and pursuant to Code of Civil Procedure, section 431.70,[4] PCGH's recovery of $200,000 shall be offset by Keck's recovery of $370,547.95." The judgment further stated, "The Court enters judgment for [Keck] against [PCGH] in the net monetary amount of $170,547.95."

C.     *The postjudgment motions*

Keck filed a motion for additur*,* or in the alternative, for a new trial limited to the issue of his damages. Keck also filed a motion for attorney fees.

PCGH filed a motion for new trial, or in the alternative, for JNOV. PCGH also filed a motion for attorney fees.

---

4     All subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

Section 431.70, relating to the pleading of an offset, states in relevant part:

"Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other . . . ."

The trial court denied PCGH's motion for new trial or JNOV, granted Keck's motion for additur or new trial on damages,[5] and denied both parties' motions for attorney fees.

D.      *The appeals*

PCGH filed a notice of appeal that stated that PCGH was appealing the judgment; the trial court's order denying PCGH's motion for new trial or in the alternative, JNOV; and the trial court's order granting Keck's motion for additur, or in the alternative, a new trial on damages.  PCGH filed a separate notice of appeal of the trial court's order denying its motion for attorney fees.

Keck filed an appeal from the trial court's order denying his motion for attorney fees.

III.

DISCUSSION

A.      *The scope of the claims reviewable on appeal*

We first consider, sua sponte, whether we have appellate jurisdiction over all of the claims raised in PCGH's appeals and Keck's appeal.[6]  (See e.g., *Drum v. Superior*

---

[5]      After PCGH refused to consent to the trial court's additur, the trial court's order granting a new trial on damages became effective pursuant to the terms of the court's order.  (See pt. III.C.1.b., *post*; see also *Jehl v. Southern Pacific Co.* (1967) 66 Cal.2d 821, 832 [noting that "[i]f the defendant fails to consent within the prescribed time [to a trial court's additur], the order granting the new trial becomes final"].)

7

*Court* (2006) 139 Cal.App.4th 845, 849 ["because the timeliness of an appeal poses a jurisdictional issue, we must raise the point sua sponte"].) For reasons explained below, we conclude that we lack appellate jurisdiction to consider several of the claims raised in the briefing on appeal, in light of the fact that the trial court granted Keck's motion for new trial on damages and vacated the judgment.

"When a motion for a new trial is granted the judgment is vacated." (*Marshall v. Brown* (1983) 141 Cal.App.3d 408, 414 (*Marshall*).) This is true even where the trial court grants only a partial new trial. (See *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 329 (*Beavers*).) The *Beavers* court explained:

> "[T]he rule is settled that the portions of the judgment which are not subject to the new trial order are nevertheless not appealable. The courts have reasoned that the new trial order has the effect of vacating the entire judgment and holding in abeyance the portions which are not subject to a new trial until one final judgment can be entered. [Citations.] As [one] court explained it in the context of a new trial on the single issue of damages, the 'superior court judgment was set aside in its entirety when the court granted a new trial as to damages . . . .' [Citation.] 'As there can be only a single judgment in an action, if the order granting the limited new trial of damages is to stand, there will be no final judgment until the trial of that issue ends and the determination of the appeal, if any, from the then judgment.' " (*Ibid*.)

In light of this authority, we lack jurisdiction to consider PCGH's claim that the trial court erred in denying its motion for new trial. The trial court's new trial order vacated the judgment, and "it has long been settled that an order denying a motion for

---

6    While this appeal was pending, this court permitted the parties to file supplemental briefs concerning the appellate jurisdiction issues addressed in this section. We address the parties' arguments concerning these issues in the text.

new trial is not independently appealable and may be reviewed only on appeal from the underlying judgment." (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19, italics omitted; see *City of Los Angeles v. Glair* (2007) 153 Cal.App.4th 813, 819-820 [dismissing appeal from order denying motion for new trial because "order denying a new trial motion is not separately appealable," and appeal could not be construed as one from the judgment under the circumstances of the case].)

We reject PCGH's contention that we may review the *denial* of its motion for new trial pursuant to authority that, "One who moves for a new trial on all issues and obtains a new trial only on limited issues is an aggrieved party who has a right of appeal from the new trial order." (*Ferraro v. Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339, 355 (*Ferraro*).) *Ferraro*, and the case law cited in *Ferraro* in support of this proposition, is premised on the fact that *any* aggrieved party may appeal from an order *granting* a new trial, even the party that moved for the new trial and had its motion granted in part. (See, e.g., *Spencer v. Nelson* (1947) 30 Cal.2d 162 (*Spencer*).) However, there is no authority that stands for the proposition that a party may appeal from an order *denying* a new trial, simply because that party has properly appealed from an order *granting* another party's new trial motion.

Further, while PCGH argues that it would be anomalous for this court to affirm an order granting a new trial on *damages* and to consider claims that go to *liability* in a subsequent appeal, given the limited nature of an interlocutory appeal from an order

9

granting a motion for new trial, that is precisely the outcome that case law contemplates. (*Marshall, supra*, 141 Cal.App.3d at p. 414; *King v. Goldberg* (1958) 159 Cal.App.2d 543, 545 [" 'It is true that certain findings of fact have been left undisturbed. When the issue selected for retrial has been tried, and findings thereon have been made, and a new judgment entered, the appeal, if any be taken, will come as an appeal from that judgment, and may include a review of the entire record,' " quoting *Universal Film Mfg. Co. v. Kerrigan* (1920) 47 Cal.App. 255, 257]; accord *Beavers, supra,* 225 Cal.App.3d at p. 329; *Love v. Wolf* (1967) 249 Cal.App.2d 822, 840.) For example, in *Marshall,* in an appeal from an order granting a new trial as to damages, the Court of Appeal explained that appellate claims that pertained to liability could be considered only in a subsequent appeal from the final judgment:

> "With a view toward economy of appellate review, we do not address other issues raised by defendants and not likely to be renewed in a new trial limited to damages. We therefore defer any consideration of the admissibility of the testimony of Jill Boxley, neither do we review the assignments of misconduct by counsel urged on this appeal. Any consideration of these issues will have to await entry of a judgment, from which defendants will then have a right of appeal." (*Marshall, supra,* at pp. 415-416.)

In this case, the issue raised in PCGH's appeal from the denial of its motion for new trial, namely, whether the parties entered into the 2006 Agreement, will not arise in the retrial on damages. However, PCGH may raise its claim that the trial court erred in

10

denying its motion for new trial on this ground in a later appeal from a final judgment entered after the new trial on damages.[7]

We also lack jurisdiction to consider PCGH's claim that the trial court erred in entering a judgment solely in Keck's favor, since, as explained above, that judgment was vacated by the trial court's order granting Keck's motion for new trial.[8] (See *Marshall, supra,* 141 Cal.App.3d at p. 414 [stating "it is clear that defendants' appeal, if any, from the judgment . . . must be dismissed" because trial court granted partial new trial on damages].)

PCGH correctly notes that the *Beavers* court stated that there was "one exception to the rule that a partial new trial order vacates and holds in abeyance the entire judgment." (*Beavers, supra*, 225 Cal.App.3d at p. 330.) The *Beavers* court discussed this exception as follows:

> "The exception occurs when the judgment retains sufficient vitality to support appellate review if the matter is otherwise properly brought before the appellate court. A new trial order, including an order for a partial new trial, is an appealable order. ([Former] § 904.1, subd. (d).) Where an aggrieved party appeals from a new trial order, then the entire judgment is subject to appellate review at that time. (*Spencer* [*supra,* 30 Cal.2d at p. 164].) 'One effect of an

---

[7]    We do consider in this appeal PCGH's claim that the trial court erred in denying its motion for JNOV on the ground that the parties did not enter into the 2006 Agreement. That is because an order denying a motion for JNOV is an appealable order, while an order denying a motion for new trial is not. (See § 904.1, subd (a)(4).)

[8]    PCGH may raise this claim on appeal from the final judgment on remand should the trial court enter a similar judgment on remand. We express no opinion on the merits of any such potential claim.

11

order granting a new trial is, of course, to vacate the judgment; however, when an appeal is taken from such an order the vacating effect is suspended, and the judgment remains effective for the purpose of an appeal from the judgment.' (*Id.* at p. 164.) That is also the situation here. [¶] The trial court granted partial judgment notwithstanding the verdict and granted a new trial as an alternative to the partial judgment notwithstanding the verdict and as to all other issues. Since plaintiffs have properly appealed from the new trial order, the judgment, including the portion affected by the judgment notwithstanding the verdict, is subject to review in this appeal." (*Ibid.*)

The exception referred to in *Spencer* is to a *protective* cross-appeal (see *Spencer, supra*, 30 Cal.2d at p. 164), which permits review of a judgment in the event that an order granting a new trial is *reversed*. (See *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 910.) That exception has no application in this case, because, for reasons we explain in part III.C., *post*, we *affirm* the trial court's order granting a new trial on damages, and thus, upon the finality of our opinion, the underlying judgment is "absolutely vacated." (*Sherwin v. Southern Pacific Co.* (1914) 168 Cal. 722, 724 ["An order granting a new trial does not absolutely vacate the judgment; it is absolutely vacated only when such an order becomes a finality"].)

It appears that the *Beavers* court may have applied the *Spencer* cross-appeal exception to suggest that a court may review those portions of a judgment that *affect* a new trial order. In *Beavers,* the "trial court granted partial judgment notwithstanding the verdict [in favor of defendants] and *granted a new trial as an alternative to the partial judgment notwithstanding the verdict . . . .*" (*Beavers, supra*, 225 Cal.App.3d at p. 330, italics added.) The *Beavers* court explained, "Since plaintiffs have properly appealed

12

from the new trial order, the judgment, including the portion affected by the judgment notwithstanding the verdict, is subject to review in this appeal." (*Ibid.*) In this case, in contrast to *Beavers,* the trial court *did not* grant a partial JNOV and, in the alternative, a new trial, and there is no need for this court to review any portion of the judgment in order to review the trial court's order granting Keck's motion for a new trial on damages.

We acknowledge that there are two cases, *Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059, 1071, footnote 5, and *Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890 (*Prichard*), in which courts have stated that on an appeal from an order granting a motion for new trial, a party may attack "parts of the judgment that were *not* subject to the new trial order." (*Prichard, supra,* at p. 901, italics added.) However, *Baker* and *Prichard* quoted the "exception" to the rule that an order granting a new trial vacates the judgment referenced in *Beavers* (*Beavers, supra*, 225 Cal.App.3d at p. 330), without providing any further analysis. In our view, *Beavers*, which states that "the rule is settled that portions of the judgment which are not subject to the new trial order are . . . *not* appealable" (*id*. at p. 329, italics added), cannot reasonably be interpreted in such a fashion. Accordingly, we follow the "settled" rule discussed in *Beavers* (*ibid*.), and applied in *Marshall*, and conclude that where a reviewing court

13

affirms an order granting a partial new trial, issues that are unrelated to the new trial order must await review in an appeal from the final judgment.[9]

In addition, we lack appellate jurisdiction to consider claims raised by both PCGH and Keck that the trial court erred in entering an order denying either party an award of attorney fees. "Under section 904.1(a)(2),[10] *postjudgment* orders granting or denying motions for attorney fees are deemed to be appealable." (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1015, italics added.) The trial court's order denying PCGH's and Keck's motions for attorney fees in this case is not a *postjudgment* order because the trial court's order granting Keck's motion for new trial vacated the judgment. Thus, the trial court's attorney fee order is not appealable. (See *Nimmagadda v. Krishnamurthy* (1992) 3 Cal.App.4th 1505, 1507-1508 [concluding order awarding attorney fees was not appealable postjudgment order because trial court granted partial new trial on damages].)

We reject PCGH's request that we review the order denying its motion for attorney fees pursuant to the collateral order doctrine. In order for that doctrine to apply, the order for which review is sought must, among other requirements, "direct[] payment of money or [the] performance of an act." (*In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059,

---

9       This is the case unless, of course, such issues are reviewable for some other reason, such as PCGH's claim that the trial court erred in denying its motion for JNOV. (See § 904.1, subd (a)(4) [providing that order denying motion for JNOV is appealable].)

10      Section 904.1, subdivision (a)(2) provides that an appeal may be taken from "an order made after a judgment . . . ."

14

1075.) In this case, the trial court's order *denying* attorney fees did not direct the payment of money or the performance of an act.

We also reject Keck's argument that he may appeal from the trial court's order denying his motion for attorney fees as a *protective cross-appeal* from the judgment. Keck's appeal from the *attorney fee* order is not a cross-appeal from the *judgment*. (*Aheroni v. Maxwell* (1988) 205 Cal.App.3d 284, 295 ["The cross-appeal procedure . . . cannot have been intended to give parties the means of securing review, by cross-appeal, of matters not related to the order or judgment which is the subject of the original appeal"].) Further, even assuming that Keck's appeal from the attorney fee order could be deemed a *protective* cross-appeal, since we *affirm* the trial court's order granting a new trial on damages (see pt. III.C., *post*), we have no basis for reaching the merits of Keck's appeal.

We do have appellate jurisdiction to consider PCGH's claim that the trial court erred in denying its motion for JNOV. (See § 904.1, subd. (a)(4) [making appealable "an order . . . denying a motion for judgment notwithstanding the verdict"]; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324 ["An appeal may be taken from an order denying a motion for JNOV even where the trial court has granted . . . a new trial motion"].) We also have jurisdiction to consider PCGH's claim that the trial court erred in granting Keck's motion for additur, or in the alternative, a new trial on damages. (See § 904.1, subd. (a)(4) [making appealable "an order granting a new trial"]; *Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 120, fn. 3 ["If a new trial is ordered as to some issues

15

but not as to others (for example, to retry the issue of damages but not of liability), the order granting the new trial is appealable by any party aggrieved by the order' "].)

Finally, we reject both parties' requests that we exercise our discretion to consider any nonreviewable appellate issues as having been brought by way of a writ petition in order to avoid further delay and expense associated with a potential subsequent appeal or appeals. The fact that PCGH has the right to bring an interlocutory appeal of the trial court's orders denying its motion for JNOV and granting Keck's motion for new trial does not provide a basis for obtaining appellate review of nonreviewable appellate issues. Because the parties will have an opportunity to obtain review of all of the issues raised in this appeal by way of an appeal from the final judgment, granting writ review would be inappropriate. (See, e.g., *Fleur du Lac Estates Assn. v. Mansouri* (2012) 205 Cal.App.4th 249, 258-259 ["because it appears that Mansouri still has an adequate remedy by appeal from the final judgment in this matter by which to seek review of the trial court's denial of her motion for attorney fees and the granting of the Association's motion to strike her costs memoranda, we deny her request to treat this premature appeal as a writ petition"].)

Accordingly, we dismiss PCGH's appeals from the judgment, the trial court's order denying its motion for new trial, and the trial court's order denying attorney fees. We also dismiss Keck's appeal from the trial court's order denying attorney fees. We consider below PCGH's claims that the trial court erred in denying PCGH's motion for JNOV and in granting Keck's motion for additur, or in the alternative, a new trial on damages.

16

B.    *The trial court did not err in denying PCGH'S motion for JNOV*

PCGH contends that the trial court erred in denying its motion for JNOV.[11] Specifically, PCGH contends that it was entitled to JNOV because there is not substantial evidence in the record to support the jury's finding that the parties entered into the 2006 Agreement.  According to PCGH, "[t]he proposed 2006 Agreement expressly required Keck's acceptance 'by returning the enclosed copy of this letter appropriately signed,' " and it is undisputed that Keck never returned a signed copy of the letter agreement.

1.    *Factual and procedural background*

After the trial court entered judgment on the jury's special verdict, PCGH filed a motion for JNOV.  In its motion, PCGH contended that there was no substantial evidence to support the jury's finding that PCGH and Keck entered into the 2006 Agreement.

PCGH noted that the trial court instructed the jury in relevant part as follows:

> "When it is clear from a provision of a proposed written contract that
> the contract would become binding only when signed and returned[,]
> as well as from any other evidence presented by the parties that both
> parties[] contemplated that acceptance of the contract terms would
> be signified by signing and returning with signature[,] the failure to

---

11    PCGH's motion was styled as a motion for new trial, or in the alternative, a motion for JNOV.  The trial court denied the motion in its entirety.  We concluded in part III.A., *ante*, that the trial court's order denying PCGH's motion for new trial is not reviewable. In this section we consider the trial court's ruling denying PCGH's motion insofar as it constitutes an order denying a motion for JNOV.

17

sign and return the offer with signature means no binding contract was created."[12]

PCGH argued that the November 30, 2006 offer letter expressly required that Keck sign and return the offer letter, and that both Keck and Bower testified that they understood that an exchange of signatures was required to establish a binding agreement. PCGH further contended that the undisputed evidence established that Keck never "signed *and* returned" (italics added) the November 30, 2006 offer letter.  PCGH maintained that there was therefore no substantial evidence to support the jury's finding that PCGH and Keck entered into the 2006 Agreement.

In his opposition, Keck noted that the jury was also instructed as follows:

> "If the respective parties orally or electronically agreed on all of the terms and conditions of a proposed written agreement with the mutual intention that their oral or electronic agreement should thereupon become binding, the mere fact that a formal written agreement to the same effect has not yet been signed and returned does not alter the binding validity of the oral or electronic agreement.

> "Whether it was the parties' mutual intention that their oral or electronic agreement to the terms contained in a proposed written agreement should be binding immediately is to be determined from the surrounding facts and circumstances."

Keck also noted that he presented both testimonial and documentary evidence demonstrating the following: (1) the parties exchanged e-mails confirming that they had each signed the 2006 Agreement; (2) PCGH notified a key client that the parties had

---

[12]    We have quoted the instruction as it appears in the reporter's transcript, with alterations to the punctuation so that it conforms to the written instruction contained in the clerk's transcript.

entered into the 2006 Agreement; (3) PCGH management informed a PCGH payroll employee that the 2006 Agreement was final; and (4) PCGH paid Keck a $50,684.93 signing bonus mandated by the 2006 Agreement.

Keck contended that the evidence presented at trial supported the jury's finding that the parties entered the 2006 Agreement "despite [PCGH] reversing position a few days after these events and firing Keck before he could actually hand over his signature page to the employment agreement."

After a hearing, the trial court denied PCGH's motion.

2.    *Governing law*

    a.    *The law governing a motion for JNOV and the applicable standard of review*

A trial court must grant a motion for JNOV whenever a motion for a directed verdict for the aggrieved party should have been granted.  (§ 629.)  " ' "[T]he power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit."  [Citation.]  "A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom.' " ' "  (*Baker v. American Horticulture Supply, Inc., supra,* 186 Cal.App.4th at p. 1072.)

Ordinarily, when reviewing a ruling on a motion for JNOV, "an appellate court will use the same standard the trial court uses in ruling on the motion, by determining

19

whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict. ' " 'If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied.' " ' " (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

b. *Applicable substantive law*

" 'Contract formation requires mutual consent, which cannot exist unless the parties "agree upon the same thing in the same sense." ' " (*HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100, 1109 (*HM DG*).) "The manifestation of mutual consent is generally achieved through the process of offer and acceptance." (*DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 813.) " ' "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." [Citations.]' [Citation.] 'Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed . . . .' " (*HM DG, supra*, at p. 1109.)

In *Devencenzi v. Donkonics* (1959) 170 Cal.App.2d 513, 518 (*Devencenzi*), an appeal from a trial court's sustaining of the defendant's demurrer, the Court of Appeal considered whether plaintiffs had adequately alleged that they had accepted defendants' contractual offer. The defendants' offer stated, "If this is agreeable to you please sign the

20

two copies.  Keep one for your files and return the other copy to me as soon as possible."

(*Id*. at p. 515.)  The plaintiffs alleged that they had " 'accepted such offer in writing.' "

(*Id*. at p. 518.)  Defendants contended that "the allegation that [plaintiffs'] 'accepted such

offer in writing' [was] insufficient and not in accordance with the condition of signing

[defendants'] letter."  (*Ibid*.)  The *Devencenzi* court rejected defendants' argument,

reasoning:

> "[W]e do not believe that signing of the letter was a 'condition' or
> only 'mode' of acceptance within the meaning of section 1582 of the
> Civil Code, which provides:
>
> " 'If a proposal prescribes any conditions concerning the
> communication of its acceptance, the proposer is not bound unless
> they are conformed to; but in other cases any reasonable and usual
> mode may be adopted.'
>
> "Looking beyond the literal meaning of the language used, we feel
> that [defendants'] offer was not burdened with, nor did it impose, an
> absolute condition as to the manner of acceptance, but only
> suggested a method which would be satisfactory to [plaintiffs].
> Consequently, it would be immaterial if such acceptance were made
> by signing [defendants'] letter, or by a separate acceptance in
> writing, if such is the fact, since no possible prejudice could have
> been suffered by [defendants] in the latter event."  (*Devencenzi*,
> *supra*, at p. 518.)

In *Estate of Crossman* (1964) 231 Cal.App.2d 370 (*Crossman*), the court cited

Civil Code section 1582 and the Restatement of Contracts[13] in determining that a party

had sufficiently manifested its assent to a contract.  In *Crossman*, the parties entered into

a written agreement giving the appellant the option to purchase a parcel of real property,

---

13      "California courts often take guidance on contract issues from the Restatement."
(*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 850, fn. 8 [citing cases].)

subject to confirmation of the sale in the probate court. (*Crossman, supra*, at p. 371.) The option agreement provided in relevant part, " 'Any notice that either party hereto desires or shall be required to give to the other hereunder shall be given in writing, either delivered personally or sent by prepaid registered mail . . . .' " (*Ibid.*) Appellant telephoned the respondent's attorney and sent the attorney a letter by *regular* mail exercising the option. (*Ibid.*) Respondent's attorney acknowledged the exercise of the option and the parties treated the option as properly exercised. (*Id.* at p. 372.) However, upon the petition to confirm the sale, appellant contended that there was "no contract because the letter sent by *ordinary* mail was . . . wholly ineffective to exercise the option . . . ." (*Ibid.*, italics added.) The *Crossman* court rejected this argument, reasoning:

> "Distinction must be made between an offer which makes a 'positive requirement' (Rest., Contracts, § 61, com. a) or imposes 'an absolute condition' (1 Williston, Contracts, § 76) of a specified manner of acceptance, on the one hand, and on the other an offer which 'merely suggests a permitted . . . manner' (Rest., Contracts, § 61; see also 1 Williston, Contracts, p. 250). In the latter case, another method of acceptance is not precluded. 'If a proposal prescribes any conditions concerning the communication of its acceptance, the proposer is not bound unless they are conformed to; but in other cases any reasonable and usual mode may be adopted' (Civ. Code, § 1582). (3) 'Care must be taken in the interpretation of offers' to determine this question, and 'it is frequently necessary to look beyond the literal meaning of the language used.' (1 Williston, Contracts, p. 250.)

> "This option agreement itself contains indications that it but suggests a mode acceptable to respondent offerors. The provision for use of registered mail is not limited to notices required by the agreement, but extends 'to any notice that either party . . . desires . . . to give to

the other.' This broad inclusion of all notices, regardless of importance, implies mere suggestion of a permissive method of communication. The extrinsic evidence shows that both sides for a long period treated the option as exercised, and the contract of purchase as complete. This contemporaneous construction lends support to the trial court's view that registered mail was not a prescribed requirement or an absolute condition, but a mere suggestion." (*Crossman, supra,* at pp. 372-373.)

The Restatement Second of Contracts (hereafter, Restatement 2d), section 60[14] provides, "If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract. If an offer merely suggests a permitted place, time or manner of acceptance, another method of acceptance is not precluded." Comment a to Restatement 2d section 60 provides, "a. *Interpretation of offer*. If the offeror prescribes the only way in which his offer may be accepted, an acceptance in any other way is a counter-offer. But frequently in regard to the details of methods of acceptance, the offeror's language, if fairly interpreted, amounts merely to a statement of a satisfactory method of acceptance, without positive requirement that this method shall be followed."

Similarly, Restatement 2d section 30 provides in relevant part, "Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances." Comment b to Restatement 2d section 30 states:

"*Invited form.* Insistence on a particular form of acceptance is unusual. Offers often make no express reference to the form of acceptance; sometimes ambiguous language is used. Language

---

14     Restatement 2d section 60 was formerly Restatement section 61.

23

referring to a particular mode of acceptance is often intended and understood as suggestion rather than limitation; the suggested mode is then authorized, but other modes are not precluded. In other cases language which in terms refers to the mode of acceptance is intended and understood as referring to some more important aspect of the transaction, such as the time limit for acceptance."

3.      *Application*

PCGH contends that the record lacks substantial evidence to support the jury's verdict finding that the parties entered into the 2006 Agreement because it is undisputed that Keck never returned a signed copy of the agreement to PCGH.

The 2006 Agreement provides in relevant part, "If this letter meets with your approval, we request that you indicate such approval by returning the enclosed copy of this letter, appropriately signed."

The jury could have reasonably found that Keck's return of the signed letter would be an *acceptabl*e form of evincing his assent to the agreement, but that the provision did not *mandate* that such return was the only possible form of acceptance. In *Devencenzi*, the acceptance provision at issue stated, "If this is agreeable to you please sign the two copies. Keep one for your files and return the other copy to me as soon as possible." (*Devencenzi*, *supra*, 70 Cal.App.2d at p. 515.) The *Devencenzi* court concluded that this language did not "impose an absolute condition as to the manner of acceptance, but only suggested a method which would be satisfactory to [plaintiffs]." (*Id*. at p. 518.) Similarly, the 2006 Agreement "request[ed]" that Keck indicate his acceptance by returning the letter signed; it did *not* state that Keck's return of the signed letter was the

24

only possible manner by which he could indicate his assent to the agreement. (See *ibid.* [concluding similar acceptance provision in contract did not mandate that contract could be accepted only by returning signed agreement].)

Thus, while PCGH notes that the court in *Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 359 stated, " '[W]hen the parties to a proposed contract have themselves fixed the manner in which their assent is to be manifested, an assent thereto, in any other or different mode, will not be presumed' " (italics omitted), the jury could have reasonably determined that the 2006 Agreement did *not* mandate a particular manner by which the parties could manifest their assent to the agreement.[15] (See also *Crossman*, *supra*, 231 Cal.App.2d at p. 372 ["Distinction must be made between an offer which makes a 'positive requirement' [citation] or imposes 'an absolute condition' [citation] of a specified manner of acceptance, on the one hand, and on the other an offer which 'merely suggests a permitted . . . manner' "; Rest. 2d, §§ 30, 60.)

Further, there is substantial evidence that Keck manifested his intent to be bound by the 2006 agreement. Keck testified that he signed the 2006 Agreement. In addition, Keck offered in evidence a copy of an e-mail that he sent to Bower on December 1, 2006

---

15    The acceptance provision in the 2006 Agreement was, at best, ambiguous as to whether it precluded Keck from manifesting his assent to be bound in some manner other than that suggested by the agreement. Thus, the interpretation of the 2006 Agreement was a question of fact for the jury. (See *Cotran v. Rollins Hudig Hall Internat., Inc,* (1998) 17 Cal.4th 93, 112.)

stating that he had signed the 2006 Agreement, and a copy of a return e-mail from Bower to Keck acknowledging Keck's signing.[16]

In addition, Keck presented evidence that PCGH acted in a manner that suggested that it believed the 2006 Agreement was binding, including informing a key client that the agreement had been finalized. (See *Crossman*, *supra*, 231 Cal.App.2d at p. 373 [concluding parties entered into option contract where "both sides for a long period treated the option as exercised, and the contract of purchase as complete"]; *Okun v. Morton* (1988) 203 Cal.App.3d 805, 819 ["Here, the conduct of the parties subsequent to the execution of the 1982 agreement and before any controversy had arisen, is persuasive evidence in determining the meaning of (the contract)"].)[17] In light of all of the

---

[16] In its opening brief, while contending that there is no substantial evidence to support the jury's finding that the parties entered into the 2006 Agreement, PCGH fails to note that Keck testified that he signed the 2006 Agreement and that Keck presented evidence demonstrating both that he informed PCGH by way of e-mail that he had signed the agreement, and that PCGH acknowledged this fact in an e-mail. In failing to cite such evidence, PCGH "ignores a fundamental rule of appellate practice obligating [it] to completely and fairly summarize the evidence supporting the court's findings and judgment." (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571.) In light of PCGH's failure to acknowledge the existence of this evidence, we would be justified in deeming its contention abandoned. (*Ibid*.) However, despite this serious omission in PCGH's opening brief, we consider PCGH's claim on the merits and reject it for the reasons stated in the text.

[17] While PCGH cites evidence that Keck acted in a manner that suggested that he did not believe the 2006 Agreement to be binding, such evidence does not demonstrate that the jury's finding that the parties entered into the 2006 Agreement is without sufficient evidentiary support.

26

foregoing evidence, we conclude that there is substantial evidence to support the jury's finding that the parties entered into the 2006 Agreement.

Accordingly, the trial court did not err in denying PCGH's motion for JNOV.

C.   *The trial court did not err in granting Keck's motion for additur, or in the alternative, a new trial on the issue of damages*

PCGH claims that the trial court erred in granting Keck's motion for additur, or in the alternative, a new trial on the issue of damages.

1.   *Factual and procedural background*

a.   *Proceedings immediately following the jury's verdict*

Immediately after the clerk recorded the verdict, the trial court stated to the jury, "I have some concerns about some of the answers on the verdict form that I need to discuss with the attorneys."  The court then excused the jury to the jury room.

Outside the presence of the jury, the court stated that neither it nor the attorneys understood "how [the jury] came up with that number [for damages]."  After an unreported chambers conference, the court brought the jury back into court and told the jurors that they would have to come back the following day for further deliberations.  The court then excused the jury for the day.  Outside the presence of the jury, the court directed the attorneys to consider "additional questions to flesh out how they came up with that number," or to explain how the jury's damage award was supported by the evidence.

27

The following day, outside the presence of the jury, the court heard argument from counsel concerning whether the court had to take any further action with respect to the jury's damage award. Keck argued that the jury had failed to award approximately $329,000 in additional damages that it should have awarded to him in light of the jury's finding that the parties had entered into the 2006 Agreement. Keck requested that the trial court ask additional questions of the jury, to clarify its verdict on damages. PCGH argued that the jury had properly interpreted the 2006 Agreement and had awarded damages consistent with that interpretation. The trial court determined that because the parties had differing views as to whether the jury's verdict as to damages was supported by the evidence, the court would not ask further questions of the jury. The court added, "I think if there's anything that needs to be done, it should be done on postjudgment motions."

b.     *Keck's motion for additur or, in the alternative, a new trial on damages*

Keck filed a motion for additur or, in the alternative, a new trial on damages. In his brief, Keck argued that the jury found that the parties entered into the 2006 Agreement and that PCGH terminated Keck without cause on December 12, 2006. Keck noted that the 2006 Agreement contained a section entitled "Severance," which provided in relevant part: " 'If the Company terminates your employment without Cause . . . then you shall be entitled to receive (i) $250,000 . . . plus (ii) the pro-rated amount of any Performance Bonus earned up to the date of termination . . . .' " Keck further argued that

28

the 2006 Agreement specified a performance bonus for 2006 of $350,000. Keck contended that jury thus should have awarded him $250,000 plus $329,808 (his prorated performance bonus for the 49 out of the 52 weeks in 2006 that he was a PCGH employee), for a total of $579,808. Keck further contended that, during closing argument, his counsel had argued that Keck was entitled to this amount of damages, and that PCGH's counsel had not disputed this amount nor argued that any other amount was the proper amount of damages. Keck requested that the court order an additur in the "net amount of $379,808,"[18] or, in the alternative, a new trial limited to the amount of Keck's damages.

In its opposition, PCGH argued that the jury's damages award was consistent with the evidence. PCGH contended that the 2006 Agreement provided that Keck was not entitled to earn a performance bonus for 2006 unless he was employed by PCGH on January 31, 2007. According to PCGH, because Keck was terminated prior to January 31, 2007, he was not entitled to any portion of the 2006 performance bonus. PCGH maintained that its interpretation of the 2006 Agreement was supported by the text of the relevant provisions as well as "the parties' negotiations" related to the agreement. PCGH further argued that the jury had carefully considered the issue, noting that the jury had

---

[18]    This amount corresponds to a damages award of $579,808 offset by the $200,000 that Keck owed PCGH on the promissory note. Keck apparently acknowledged that he was not entitled to recover both the $100,000 bonus payable under the 2005 Agreement, as well as a severance payment under the 2006 Agreement. Keck did not claim in his motion briefing that he was entitled to any additional portion of the contemporaneous bonus specified in the 2006 Agreement beyond that already paid by PCGH in 2006.

29

asked two questions during deliberations that concerned the relationship between bonus payments and employment status.[19]  Finally, PCGH argued that the jury's award was consistent PCGH's interpretation of the 2006 Agreement.[20]  PCGH supported its motion with various exhibits, including drafts of the 2006 Agreement that the parties had exchanged during contract negotiations.

After further briefing and a hearing, the trial court granted Keck's motion.  In its order, the court reasoned:

> "[Keck] brings a motion for additur or in the alternative a motion for new trial limited to the issue of damages.
>
> "After review of the motion, opposition thereto, reply and all other relevant documents the Court concludes that Keck has established a

---

[19]    In its first note, the jury asked, "Can we get clarification on Juror Special Instruction No. 8 . . . , specifically regarding written policy to pay/not pay bonus only to employees who are employed at the end of the calendar year?"  Special Instruction No. 8 was entitled, "Bonus Policy Not to Be Considered," and stated, "You should not consider any unwritten policy of [PCGH] to pay bonus only to employees who are employed at the end of the calendar year in determining whether [PCGH] owed [Keck] bonus."  The court responded to the jury's question by stating, "[PCGH] did not have a written policy requiring employees to be present at the end of the year to receive a bonus."
     In its second note, the jury asked, "Is the last sentence of [the 2006 Bonus provision of the 2006 Agreement] 'if you are still employed on that date,' legally enforceable in reference to Special Instruction No. 8?"  The court responded in relevant part, "If you find that the [2006 Agreement] is the operative agreement then the terms are enforceable.  You should consider [the 2006 Agreement] in its entirety."

[20]    PCGH contended that the jury's $270,547.95 damage award was based on an award of $250,000 pursuant to the severance provision, plus $70,547.95, which reflected a prorated portion of the $250,000 contemporaneous bonus, minus $50,000, which reflected an approximation of the $50,684.93 PCGH had already provided to Keck in November 2006.

basis for an additur and/or a new trial under . . . section 657, i.e., inadequate damages.

"The jury found that the parties had entered in into [the 2006 Agreement] replacing the terms of their initial letter offer. (The parties agree that Exhibit 120[21] states the applicable contract terms.)

"Based on the fact that the jury concluded the Severance provision applied and such finding could only have been reached if the jury concluded Keck was terminated without cause, the jury implicitly found that Keck was terminated without cause.[22] The 2006 contract expressly stated the amounts of Severance Bonus pay due Keck if [PCGH] terminated him without cause. As a result of the jury's finding that the termination was without cause, the award should have included the prorated share of the Performance Bonus as set forth under the Severance provision which would have resulted in Keck being entitled to Severance pay equal to a prorated bonus for 49 out of 52 weeks. Thus, under the Severance provision, Keck was entitled to $250,000 in Severance pay plus $329,808 for a Performance Bonus ($350,000 prorated for 49 out of 52 weeks). In light of the jury's failure to award the prorated Performance Bonus, the Court finds the jury's verdict to be inadequate.

"In accordance with Code of Civil Procedure 662.5 [subdivision] (a), the Court denies Keck's request for a new trial on the grounds of inadequate damages provided [PCGH], no later than June 15, 2012 files a written consent to increase the amount of the judgment to include a payment of an additur in the new amount of $329,808. This increase, as stated above, includes the prorated Performance Bonus owed Keck that the Court, in its independent judgment, determines from the evidence to be an accurate interpretation of the evidence and an amount to be fair and reasonable. If [PCGH] does not file such a consent within the time provided, Keck's motion is granted and a new trial is ordered in this action limited to the issue of damages on the Cross-Complaint."

---

21    Exhibit 120 has been transmitted to this court.

22    PCGH does not contend on appeal that it terminated Keck for cause.

31

PCGH refused to consent to the additur, and thus, the trial court's order directing a new trial on damages became effective.

2.      *Governing law and standard of review*

In *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1415, the court outlined the law governing a motion for new trial based on inadequate damages, as well as the standard of review to be applied in reviewing a trial court's ruling on such a motion:

> " 'Code of Civil Procedure section 657 states:  "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."  A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal.  [Citation.]  An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice.' "

In *Barrese v. Murray* (2011) 198 Cal.App.4th 494, the Court of Appeal emphasized that in ruling on a motion for new trial, the trial court may independently answer any questions of fact relevant to such a motion:

> "The powers of a trial court in ruling on a motion for new trial are plenary.  The California Supreme Court has held that the trial court, in ruling on a motion for new trial, has the power 'to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact' [citation], that the court sits as 'an independent trier of fact' [citation] and that it must 'independently assess[] the evidence supporting the verdict' [citation].  The trial judge has 'to be satisfied that the evidence, as a

32

whole, was sufficient to sustain the verdict; if he was not, it was not only the proper exercise of a legal discretion, but his duty, to grant a new trial.' [Citation.]" (*Id*. at p. 503.)

Section 662.5 grants a trial court the power to issue a conditional additur order under the following circumstances:

"(a) In any civil action where after trial by jury an order granting a new trial limited to the issue of damages would be proper, the trial court may in its discretion:

"(1) If the ground for granting a new trial is inadequate damages, issue a conditional order granting the new trial unless the party against whom the verdict has been rendered consents to the addition of damages in an amount the court in its independent judgment determines from the evidence to be fair and reasonable."

3.      *The 2006 Agreement*

The 2006 Agreement contains a section entitled "Severance," which provides in relevant part:

"If [PCGH] terminates your employment without Cause, . . . then you shall be entitled to receive (i) $250,000 payable over six months in equal semi-monthly installments, plus (ii) the pro-rated amount of any Performance Bonus *earned up to the date of termination*, payable of the date that such Performance Bonus otherwise would have been paid to you." (Italics added.)

In a section entitled "Compensation," the 2006 Agreement provides in relevant part:

"Bonus for 2006.  Contemporaneous Bonus of $250,000 (prorated for the remainder of the year) paid semi-monthly, beginning on September 19, 2006, plus a Performance Bonus of $350,000, which will be paid to you on January 31, 2007, *if you are still employed on that date*, offset by any amounts previously advanced to you." (Italics added.)

33

Also in the section entitled "Compensation" are the following provisions:

> "Bonus for 2007. Contemporaneous Bonus of $350,000 paid semi-monthly. In addition, you will be able to earn a Performance Bonus of $400,000 payable on January 31, 2008 (a portion of which may be deferred on the terms set forth below to the extent that PCG AM's[23] profits do not support payment on January 31, 2008)."

> "Bonus for 2008. Contemporaneous Bonus of $500,000 paid semi-monthly. In addition, you will be able to earn a Performance Bonus of $450,000 payable on January 31, 2009 (a portion of which may be deferred on the terms set forth below to the extent that PCG AM's profits do not support payment on January 31, 2009)."

4.     *The parties' contentions on appeal*

PCGH argues that, contrary to the trial court's ruling on Keck's motion for new trial, Keck was not entitled to any portion of his 2006 performance bonus pursuant to the severance provision in the 2006 Agreement because Keck was not employed by PCGH on January 31, 2007. Relying on the portions of the severance and bonus provisions italicized above, PCGH argues that it is "unambiguous that under the Severance provision any Performance Bonus to be paid under that provision is prorated to what is earned to the date of discharge." PCGH further notes that Keck was discharged prior to January 31, 2007, and that the 2006 performance bonus provision stated that the bonus would "be paid to you on January 31, 2007, if you are still employed on that date." PCGH argues that because Keck was discharged "more than a month before he would have earned any

---

23     The agreement states that PCGH would initially employ Keck and that "[a] subsidiary of PCGH, currently anticipated to be PCG Asset Management, LLC ('PCG AM')," would thereafter assume Keck's employment.

34

2006 Performance Bonus," he was not entitled to any portion of the 2006 performance bonus pursuant to the severance provision.

PCGH contends that its interpretation of the 2006 Agreement is supported by the fact that while the 2006 performance bonus provision contained a requirement that Keck be employed by PCGH in order to receive the bonus, "neither the 2007 nor 2008 bonus provisions contained any requirement that Keck be employed into the following year." PCGH also argues that its interpretation of the 2006 Agreement is further supported by the fact that the agreement was negotiated at "a time when the parties knew of the financial hardships PCGH had faced and was facing," and that "CalPERS was scrutinizing PCGH's turnover and PCGH needed Keck to remain employed." Finally, PCGH contends that the jury properly interpreted the 2006 Agreement and the trial court "abused [its] discretion in overriding the jury's unanimous verdict and deciding that the damages awarded was inadequate."

In his respondent's brief, Keck contends that the trial court properly ordered a new trial as to damages because under the express terms of the severance provision, Keck was entitled to a prorated portion of his 2006 performance bonus. Keck argues in part:

> "[PCGH] absurdly interprets the contract to say that Keck gets a pro-
> rated amount of nothing because he had to be present at the end of
> the year. This is nonsensical and contradictory. A pro-rated amount
> is, by definition, the opposite of [an] all or nothing amount. The
> only way to make any sense of the Severance provision is to read it
> as urged by Keck."

35

### 5.    *Application*

The fact that the severance provision refers to a "pro-rated" portion of the bonus, thereby suggesting that Keck would be entitled to some portion of the bonus if he were to be terminated prior to earning the entire bonus (as in fact occurred), supports Keck and the trial court's interpretation of the 2006 Agreement.  (See severance provision of 2006 Agreement [mandating payment of "the *pro-rated* amount of any Performance Bonus earned up to the date of termination, payable on the date that such Performance Bonus otherwise would have been paid to you" (italics added)].)  Further, the severance provision draws a distinction between the concept of when a bonus would be "earned" and when it would become "payable."  The 2006 performance bonus provision does not state when Keck would *earn* the performance bonus; rather, it states only that it would be "*paid* to

you on January 31, 2007, if you are still employed on that date" (italics added).  Thus, the 2006 Agreement may reasonably be interpreted as providing that Keck *earned* a bonus for 49 out of the 52 weeks in 2006 for which PCGH employed Keck, and that, pursuant to the severance provision, this amount was "*payable* as of the date that such Performance Bonus otherwise would have been paid to [Keck]."

On the other hand, PCGH's interpretation is not entirely without textual support. The 2006 bonus provision, unlike the 2007 and 2008 provisions, mandates that the bonus would be paid on a date certain "if [Keck is] still employed on that date."  In light of this language, the 2006 performance bonus provision can reasonably be interpreted as

36

providing that Keck would earn a 2006 performance bonus only if he were employed by PCGH on January 31, 2007. (See 2006 Bonus provision of 2006 Agreement [providing for "Performance Bonus of $350,000, which will be paid to you on January 31, 2007, if you are still employed on that date"].) PCGH also points to extrinsic evidence that it contends supports its interpretation of the agreement (namely, the circumstances surrounding the parties' negotiations of the 2006 Agreement).[24]

In light of these two reasonable interpretations of the 2006 Agreement, we conclude that the text of the 2006 Agreement is ambiguous as to whether Keck was entitled to recover a prorated amount of his 2006 performance bonus pursuant to the severance provision in the amount of $329,808 ($350,000 prorated for 49 out of 52 weeks Keck was employed in 2006) or instead, was entitled to receive no portion of his 2006 performance bonus pursuant to the severance provision because he was not employed by PCGH on January 31, 2007. (See *Horath v. Hess* (2014) 225 Cal.App.4th 456, 464 [" 'If a contract is susceptible to two different reasonable interpretations, the contract is ambiguous' "].)

Because the meaning of the 2006 Agreement is ambiguous, the interpretation of the agreement, like the amount of damages to be awarded, was a question of fact[25]—first

---

[24]  PCGH opposed Keck's motion in the trial court with various items of extrinsic evidence including drafts of the 2006 Agreement.

[25]  (See *Cotran v. Rollins Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th at p. 112 ["If the terms of the contract are ambiguous or uncertain . . . determining the contract's terms

37

for the jury, and then for the trial court—on Keck's motion for new trial. (See, e.g., *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1257-1258 ["On a motion for new trial, the trial court sits in its role as an independent trier of fact and may ' "[d]isbelieve witnesses, reweigh evidence and draw reasonable inferences that are contrary to those drawn by the jury" ' "]; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1247 ["The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial"].) In ruling on Keck's motion for new trial, the trial court was therefore free to interpret the ambiguous 2006 Agreement as providing that Keck was entitled to recover a portion of his 2006 performance bonus pursuant to the agreement's severance provision.

Accordingly, we conclude that the trial court did not abuse its discretion in granting Keck's motion for additur, or in the alternative, a new trial on damages.

IV.

DISPOSITION

PCGH's appeals from the judgment, the trial court's order denying its motion for new trial, and the trial court's order denying its motion for attorney fees are dismissed. Keck's appeal from the trial court's order denying his motion for attorney fees is also dismissed.

---

is a question of fact for the trier of fact . . . based on 'all credible evidence concerning the parties' intentions . . . ' "].)

The trial court's order denying PCGH's motion for JNOV is affirmed.  The trial court's order granting Keck's motion for new trial on damages is affirmed.  The matter is remanded to the trial court with directions to conduct a new trial on damages and any other necessary proceedings.

PCGH is to bear costs of its appeals.  Keck is to bear costs of his appeal.

_____

AARON, J.

WE CONCUR:

_____

HALLER, Acting P. J.

_____

O'ROURKE, J.